In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3933

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GARY E. PEEL,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06-cr-30049-WDS—**William D. Stiehl**, *Judge*.

ARGUED DECEMBER 10, 2009—DECIDED FEBRUARY 12, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant was convicted by a jury of bankruptcy fraud, obstruction of justice, and possession of child pornography, and was sentenced to 144 months in prison. His appeal challenges both the convictions and the sentence.

The events giving rise to this case go back a long way. In 1967 the defendant married. Seven years later he began an affair with his wife's 16-year-old sister. In the course

of the affair, which lasted several months, he took nude photographs of her that the jury found were sexually explicit within the meaning of the child-pornography statute; he does not contest that finding. In response to her later request for the pictures, he gave her some of them (which she then destroyed) and, without telling her, retained others in a file in his office.

In June 2003 the Peels divorced, and agreed to a marital settlement. The following year Peel filed suit in an Illinois state court to vacate the settlement. The year after that he filed for bankruptcy and asked the bankruptcy court to discharge the financial obligations to his ex-wife that the settlement agreement had imposed. She opposed the discharge and filed a claim for the money that he owed her under the settlement. "Discharge" may not be the right word for what he was seeking—"abandonment" probably is better—because his debt to her under the settlement probably was not dischargeable in bankruptcy under the Bankruptcy Code as it then read. 11 U.S.C. §§ 523(a)(5), (15)(A), (B) (2005); *In re Crosswhite*, 148 F.3d 879, 881-82 (7th Cir. 1998); *In re Reines*, 142 F.3d 970, 972-73 (7th Cir. 1998); *In re Daulton*, 139 B.R. 708, 710 (Bankr. C.D. Ill. 1992). (Under the current Code, it almost certainly would not be dischargeable. See 11 U.S.C. §§ 101(14A), 523(a)(5), (15).) So he had to persuade her to drop the claim.

Negotiations looking to compromise it were predictably acrimonious and in the course of them the defendant told her about the nude photographs of her sister and said that "these would be . . . an item that would likely get out into the public if we didn't stop this escalating battle

of putting things in the newspaper." He backed up his threat by placing photocopies of the photographs in her mailbox. She complained to the police and later to federal authorities, and at their direction made recorded phone calls to the defendant. The conversations confirmed that he was blackmailing her with the photographs. He faxed her a draft of a settlement agreement that she had previously rejected, adding a provision requiring him to return certain unidentified photographs to her. They met and he showed her the originals. The meeting was recorded, and included an exchange in which she said: "So you resort to blackmailing me?" He replied: "There's nothing left. I'm down to: no kids; no grand-kids; no money." "And, so," she responded, "blackmailing me with photographs . . . . Okay, but as long as I go ahead and sign these settlement agreements . . . ." He replied: "Right then you have . . . ." And she: ". . . you'll give me the photographs . . . ." And he: "On the spot."

He was convicted as we said of both bankruptcy fraud and obstruction of justice. He argues that to convict him of both violated the double jeopardy clause of the Fifth Amendment, because one offense is included in the other. It might seem that there would be no issue of double jeopardy in a case in which multiple convictions occurred in the same trial, *Williams v. United States*, 150 F.3d 639, 641 (7th Cir. 1998); *United States v. Masters*, 978 F.2d 281, 285 (7th Cir. 1992), since the purpose of the clause is "'to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.'" *Missouri v. Hunter*, 459 U.S. 359, 365-68 (1983), quoting *Burks v. United*

*States,* 437 U.S. 1, 11 (1978). But the Supreme Court has held that "with respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause . . . prevent[s] . . . the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, *supra*, 459 U.S. at 366; see also *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) ("the final component of double jeopardy—protection against cumulative punishments— is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature"); *United States v. Konopka*, 409 F.3d 837, 838-39 (7th Cir. 2005); *United States v. Fischer*, 205 F.3d 967, 969 (7th Cir. 2000); *United States v. Hector*, 577 F.3d 1099, 1100-11 (9th Cir. 2009); *United States v. Miller*, 527 F.3d 54, 70-73 (3d Cir. 2008). Some of the Justices disagree with this extension of the double jeopardy clause—see the discussion of their views in *White v. Howes*, 586 F.3d 1025, 1032-35 (6th Cir. 2009)—but for now, at least, it is the law and binds us.

So are bankruptcy fraud and obstruction of justice committed in a bankruptcy proceeding the same offense for purposes of double jeopardy? Bankruptcy fraud requires, so far as relates to this case, that the defendant "knowingly and fraudulently . . . offers compensation . . . for . . . forbearing to act in any case under" the Bankruptcy Code. 18 U.S.C. § 152(6). ("[F]orbearing to act" in this case would mean his ex-wife's abandoning her bankruptcy claim.) Obstruction of justice requires that the defendant "corruptly obstructs, influences, or impedes any official proceeding, or attempts to do so." 18

U.S.C. § 1512(c)(2). So the elements of the offenses are different, as the government points out. But since a bankruptcy proceeding is an "official proceeding," within the meaning of the obstruction of justice statute, 18 U.S.C. § 1515(a)(1)(A) ("the term 'official proceeding' means . . . a proceeding before . . . a bankruptcy judge"), the defendant's conviction for having attempted fraudulently to influence the bankruptcy proceeding by blackmailing his ex-wife into agreeing to drop her claim convicted him of obstruction of justice as well.

The test for "whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Missouri v. Hunter*, *supra*, 459 U.S. at 366, quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The test was flunked here because convicting Peel of obstruction of justice did not require proof of any fact that didn't have to be proved to convict him of bankruptcy fraud. It was thus a lesser-included offense of bankruptcy fraud and the *Blockburger* test makes clear, and many cases hold, that to punish a person for a lesser-included offense as well as the "including" offense is double jeopardy unless Congress intended the double punishment. *Rutledge v. United States*, 517 U.S. 292, 297-98 and n. 6 (1996); *United States v. Fischer*, *supra*, 205 F.3d at 969; *United States v. Xavier*, 2 F.3d 1281, 1291 (3d Cir. 1993). The government does not argue that Congress intended that.

This is like a case in which a person is tried for both murder and attempted murder. The elements are different, but since conviction for murder automatically

convicts the defendant of attempted murder (for there can be no murder without attempting the deed), the defendant cannot be convicted of both crimes. See, e.g., *People v. Davidson*, 70 Cal. Rptr. 3d 913, 917-18 (App. 2008). There is an exception for cases in which the defendant was convicted of the lesser-included offense before he could have been prosecuted for the greater one, as when the defendant is convicted of attempted murder and later his victim dies. In such a case he can be tried for murder. *People v. Carrillo*, 646 N.E.2d 582, 584-85 (Ill. 1995). The exception has no application to this case, which must therefore be remanded with directions that the judge vacate one of the two convictions.

The defendant argues that his conviction for obstruction of justice is the one that should be vacated, even though it carries the higher statutory maximum sentence, because it is a lesser-included offense of bankruptcy fraud. It is lesser in the sense of having fewer elements, see *United States v. Smith*, 34 F.3d 514, 517-18 (7th Cir. 1994); *United States v. Harley*, 990 F.2d 1340, 1343-44 (D.C. Cir. 1993), because one can commit obstruction of justice without committing bankruptcy fraud but not bankruptcy fraud without committing obstruction of justice. That is the only sense of "lesser" that matters under the *Blockburger* test: that offense $A$ has elements $a$, $b$, $c$, and offense $B$ has elements $a$, $b$, $c$, and $d$, so that conviction of $B$ automatically convicts the defendant of $A$ as well. The remedy is to eliminate the doubleness. But which conviction must be vacated is not dictated by the Constitution. It is a matter committed to the trial judge's discretion because functionally it is a decision con-

cerning the length of the defendant's sentence. *Ball v. United States*, 470 U.S. 856, 864 (1985); *Lanier v. United States*, 220 F.3d 833, 841-42 (7th Cir. 2000); *United States v. Fischer, supra*, 205 F.3d at 970 n. 2; *United States v. Hector, supra*, 577 F.3d at 1103-04; *United States v. Miller, supra*, 527 F.3d at 74. But usually it's the conviction carrying the lesser penalty that is vacated. As we noted in *Lanier*, it would be paradoxical to give the defendant a shorter sentence than he would have received had the government not also charged him with the less serious offense. 220 F.3d at 842.

What is true is that in a case in which the lesser-included offense has fewer elements *and* is the less serious offense, vacating the sentence for the graver offense would be an abuse of discretion: imagine convicting a person of attempted murder and of murder and punishing him only for the attempt. This is not such a case; the lesser-included offense of obstruction of justice is the graver offense.

The defendant argues that it was not proved beyond a reasonable doubt that he had committed either bankruptcy fraud or obstruction of justice. Regarding the obstruction charge, he argues that he did not act "corruptly" because he was prepared to disclose the photographs to the bankruptcy court. That is a distortion of the deal he tried to make with his ex-wife. The deal was that she would abandon her claim and in exchange would get the photographs. He expected her to keep them secret from the world, including the bankruptcy court, not only because they were an embarrassment but also

because if the bankruptcy judge discovered that his ex-wife had been blackmailed into dropping her claim he would be certain to notify the authorities and the deal would collapse. Peel's expectation of secrecy was disappointed because his ex-wife went to the police. So there was no actual obstruction of justice, merely an attempt, but the statute punishes the attempt equally with the achieved obstruction.

His main argument against the conviction for bankruptcy fraud is that his object was to get his ex-wife to drop her opposition to his state-court suit to dissolve the marital agreement. That was one object but he also wanted her claim in the bankruptcy proceeding dismissed because in all likelihood it was not dischargeable in bankruptcy.

He further argues that bankruptcy fraud does not extend to fraud committed in an "adversary proceeding" in bankruptcy. The term refers to proceedings to resolve claims within the overall bankruptcy case; a proceeding to object to the discharge of a debt or to determine its dischargeability is a typical adversary proceeding. Fed. R. Bankr. P. 7001(4), (6); see *Zedan v. Habash*, 529 F.3d 398, 402-03 (7th Cir. 2008); *In re Marchiando*, 13 F.3d 1111, 1113-14 (7th Cir. 1994); *In re Duncan*, 448 F.3d 725, 726 (4th Cir. 2006). An adversary proceeding is thus part of the bankruptcy but it is not the bankruptcy case itself, as illustrated by the fact that the dismissal of an adversary proceeding is an appealable final order even though the bankruptcy case continues. *In re Marchiando, supra*, 13 F.3d at 1113-14.

Bankruptcy fraud is fraud committed "in any case under title 11" of the U.S. Code, 18 U.S.C. § 152(6), that is, under the bankruptcy code; and we cannot find any authority on whether *all* adversary proceedings in bankruptcy are "case[s] under title 11" within the meaning of the section. The fact that some adversary proceedings can be heard in state court, 28 U.S.C. §§ 1334(a), (b); 1 *Collier on Bankruptcy* ¶ 3.01[1] (15th ed. 2009), and that in many such proceedings no issue of bankruptcy law is presented (often an adversary proceeding is a tort or contract suit governed by state law, see, e.g., *In re Teknek, LLC*, 512 F.3d 342, 345 (7th Cir. 2007); *Alliance to End Repression v. City of Chicago*, 356 F.3d 767, 771 (7th Cir. 2004); *SNA Nut Co. v. Haagen-Dazs Co.*, 302 F.3d 725, 729 (7th Cir. 2002); *In re Caldor Corp.*, 303 F.3d 161, 163-64 (2d Cir. 2002)), suggests a negative answer. But a number of cases suggest (none to the contrary) that at least fraud in an adversary proceeding involving dischargeability is bankruptcy fraud. *In re Kallstrom*, 298 B.R. 753, 758-59 and n. 25 (10th Cir. BAP 2003); *In re Parker*, 2003 WL 21703528, at *3 (Bankr. N.D. Ga. July 18, 2003); *In re Taylor*, 190 B.R. 413, 416 n. 3 (Bankr. D. Colo. 1995); *In re Nicolosi*, 86 B.R. 882, 887-88 (Bankr. W.D. La. 1988); 10 *Collier on Bankruptcy*, *supra*, ¶ 7041.01. If the debtor succeeds in obtaining a discharge, a creditor or class of creditors particularly favored by Congress is hurt; hence Bankruptcy Rule 7041 forbids dismissal of a complaint objecting to a debtor's discharge except on notice to the trustee in bankruptcy (as well as to the U.S. Trustee and anyone else that the bankruptcy court directs to be notified). In any event, since the ex-wife's claim in this case

was the biggest claim in the bankruptcy proceeding, had the defendant succeeded in knocking it out by his fraud his action would have been fraud in the proceeding itself rather than in an adversary proceeding that had only a tangential effect on the overall bankruptcy case.

We move to the defendant's conviction under 18 U.S.C. § 2252A for possession of child pornography, defined as sexually explicit images of a minor. 18 U.S.C. § 2256(8). The first federal child pornography statute, enacted in 1978 (four years after the defendant took the photographs of his 16-year-old sister-in-law), defined a "minor" to mean anyone under 16. Protection of Children Against Sexual Exploitation Act, Pub. L. No. 95-225, § 2253(1), 92 Stat. 7 (1978). An amendment in 1984 redefined "minor" as anyone under 18. Pub. L. 98-292, § 253(1), 98 Stat. 204 (1984). The defendant was charged with possession of child pornography in 2005 and 2006, long after the statute had been amended to raise the age of majority. But he argues that since the photographs were not illegal when made, the amended statute is inapplicable to him.

He does not argue that Congress can't criminalize the continued possession of pornography that was legal when created. *United States v. Bateman*, 805 F. Supp. 1053, 1055 (D.N.H. 1992); *United States v. Porter*, 709 F. Supp. 770, 774 (E.D. Mich. 1989), aff'd, 895 F.2d 1415 (6th Cir. 1990). But he contends that unless his interpretation is adopted, the statute will be incoherent because it creates an "affirmative defense" for cases in which either the "minor" depicted in the pornography possessed by the defendant

was actually an adult or the pornography was not pro-duced "using any actual minor." 18 U.S.C. § 2252A(c). (The two clauses are redundant—the second includes the first—but the second is broader because it includes the case in which no person was used in the creation of the pornographic depiction; it might be a painting of an imaginary person or a computer simulation.) One func-tion of the affirmative defense, he argues, is to grand-father the possession of pornography that was legal when it was created. Peel did not raise the issue in the district court, but it is the heart of his challenge to his conviction for child pornography.

At argument the government's lawyer conceded that to prove a violation of the statute the government has to prove that a real-life minor, not a computer simulation or an adult looking like a minor, was used in the creation of the pornography. The effect of an affirmative defense that entitled the defendant to prove the contrary would thus be that the government would have to prove that a child was used and the defendant would have to prove that a child wasn't used. The statute is confused, but not that confused; and the least plausible interpretation is that it grandfathers a category of what the law now deems to be child pornography.

The affirmative defense came into the statute in 1996, when Congress in the Child Pornography Prevention Act, Pub. L. No. 104-208, § 121, 110 Stat. 3009-26 (1996), for the first time outlawed virtual child pornography—pornography involving a computer simulation of a child rather than an actual child: an image "that . . . appears to

be . . . of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(B) (1996). This language could have been thought to reach a case in which an adult who looked like a child was used in the production of pornography rather than an actual child. But that was not Congress's intent; its concern was with computer simulations. Hence the affirmative defense, explained in the Senate committee report as follows:

> [The bill] . . . does not, and is not intended to, apply to a depiction produced using adults engaging in sexually explicit conduct, even where a depicted individual may appear to be a minor. Accordingly, the bill includes . . . an affirmative defense provision for material produced using adults. Under that provision, it is an affirmative defense to a charge under section 2252A that the material in question was produced using an actual person or persons engaging in sexually explicit conduct, each of whom was an adult at the time the material was produced, provided the defendant did not intentionally pander the material as being child pornography.

S. Rep. No. 358, 104th Cong., 2d Sess. 21 (Aug. 27, 1996).

Within a few years, however, the defense was overtaken by the Supreme Court's decision holding that the production of non-obscene pornography in which no child was involved cannot constitutionally be prohibited, because there is no sexual abuse in such a case, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250-51 (2002), and only the presence of that abuse, the Court ruled, justifies the suppression of pornography that does not cross the line

to obscenity. The government must therefore prove that a child was used unless the pornography is considered obscenity, which only a subset of pornography is, see, e.g., *United States v. Schales*, 546 F.3d 965, 971-72 (9th Cir. 2008); 18 U.S.C. § 1466A, and the statute under which Peel was convicted is not an obscenity statute. *United States v. Irving*, 452 F.3d 110, 120 (2d Cir. 2006); *United States v. Hilton*, 386 F.3d 13, 16 (1st Cir. 2004) (per curiam). (He does not argue that because the photos of his sister-in-law were not illegal when he took them, they could not constitute sexual abuse of a minor.)

With the government thus required to prove beyond a reasonable doubt that the apparent child in the pornographic image is a real child, the only work left for the provision creating the affirmative defense is to require (in a part of the provision that we did not quote) that the defendant notify the government of his intention to challenge the government's proof that a child was used.

The history makes clear that the affirmative defense was not added to the statute in order to grandfather pornography created before the definition of a child was changed from younger than 16 to younger than 18. It was added to exculpate child pornography made with adult rather than child models, at a time when the Supreme Court had not yet ruled that the making of such pornography could not constitutionally be punished, and therefore at a time when Congress thought it could place the burden of proof concerning the age of the model used in producing the pornography on the defendant rather than on the government. There isn't the slightest indica-

tion of a congressional purpose to grandfather a category of child pornography, so that anyone who happened to have pornographic photographs of 16- and 17-year-olds taken before 1984 would be free to market them. Such a person would have a market that was shielded from new competition and thus offered him substantial profit opportunities—because after 1984 there could be no further legal production of such pornography in which an actual child had been used. The possessor would enjoy the same kind of quasi-monopoly as some-one who possesses paintings by an artist when he dies pre-maturely, freezing the quantity of his output and thus pushing up the price.

Possession of a photograph of an underage girl or boy must be knowing, however, and the defendant, besides invoking the affirmative defense, argues that the gov-ernment failed to prove that he knew in 2005 and 2006 that his sister-in-law had been under 18 when he took the photographs. Actually the evidence of his knowledge was extensive. He had known her since she was in fourth grade, had spent a great deal of time with her at the time of his marriage to her sister, when she was in high school, and years later had represented her (the defendant is a lawyer) in her divorce proceeding.

We turn to the sentencing issues. In calculating intended loss for purposes of determining the guideline range for the defendant's offenses of bankruptcy fraud and obstruc-tion of justice, the judge began with the amount that the defendant owed his ex-wife under the terms of the marital settlement—$230,000—and the amount that the

settlement required him to pay her in the future—$2500 per month for the rest of Peel's life. His life expectancy was 17.5 years, so the estimated total payout over that time would be $525,000. So far, so good, for Peel hoped by his blackmail to get her to drop both claims. But Peel argues that the estimated $525,000 in future monthly payments that he owed his ex-wife should be discounted to present value, since a smaller sum received today and conservatively invested would yield $525,000 over a period of 17.5 years. In civil cases in which the loss for which damages are sought will be incurred in the future (as where the plaintiff in an accident case is disabled from earning future income), courts reduce the future loss to a sum that the plaintiff could invest safely at an interest rate at which the sum would grow to an amount that would compensate him fully for his future loss. See, e.g., *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 819 (7th Cir. 1994).

Courts do this because civil damages (excluding punitive damages) seek to put the plaintiff in the financial position that he would have occupied had he not been wronged by the defendant. *Illinois School Dist. Agency v. Pacific Ins. Co.*, 571 F.3d 611, 617 (7th Cir. 2009). Because the aim of criminal sanctions is to punish, we find provisions in the sentencing guidelines that would strike a discordant note in a civil case—such as the direction to sentencing judges to include even those losses that "would have been impossible or unlikely to occur," U.S.S.G. § 2B1.1, Advisory Note 3(A)(ii), and the further direction that "loss shall not include the

following: Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs," U.S.S.G. § 2B1.1, Advisory Note 3(D)(i), so that the offense level for a financial crime is not increased if the prosecution is delayed, even though the delay increases the cost of the crime.

The question whether to discount future losses (actual or intended) to present value seems to have arisen rarely in criminal cases. A few cases, however, have discounted a future intended loss to present value, such as *United States v. Broderson*, 67 F.3d 452, 457 (2d Cir. 1995), where just as in a civil case the court required discounting to present value an expected stream of monthly payments of which the defendant had defrauded the government. See also *United States v. Edgar*, 971 F.2d 89, 93-94 and n. 5 (8th Cir. 1992); *United States v. Brown*, 338 F. Supp. 2d 552, 559 (M.D. Pa. 2004). We have found no cases that refused to discount a future loss to present value if asked to do so. Almost everyone would rather lose $2 in 20 years than $1 today, and this implies that the loss inflicted by appropriating a $2 benefit that the victim would have to wait 20 years to receive is less than taking $1 from him now.

So if a defendant presents credible evidence for discounting a stream of future payments to future value, the district court must consider it. And in this case the defense presented expert evidence that the present value of the stream of future monthly payments that Peel owed his ex-wife was $314,000. This amount, if adopted as the measure of intended future loss and added to

the intended present loss of $270,000, would, after sub-traction of the $158,000 in cash that the ex-wife would have received under the agreement that Peel tried to force on her, have produced an offense level two levels below the one applied by the district court. The court, however, rejected the effort to prove present value on the ground that U.S.S.G. § 2B1.1, Application Note 3(E), entitled "Credits Against Loss," does not include, among the credits listed, discounting to present value; credits are such things as "the fair market value of the property returned" to the victim by the criminal before the offense was detected. But credits presuppose that the loss or intended loss has been determined and afterward part of it was restored, as in a case where an embezzler gambles successfully with the embezzled funds and so is able to (and does) return those funds. The amount of the embezzlement is the loss, *United States v. Lauer*, 148 F.3d 766, 767-68 (7th Cir. 1998); *United States v. Mount*, 966 F.2d 262, 266-67 (7th Cir. 1992), but the harm caused by the loss is lessened by the criminal's voluntary act. That has nothing to do with calculating the loss; the calculation precedes consideration of any credits to which the defendant is entitled; and so the application note has no relevance to whether loss is measured by its discounted or an undiscounted value.

We are reluctant to make federal sentencing more complicated than it is, but requiring a calculation of the present value of a future loss, if the defendant presents credible evidence, need not burden the judge, let alone put him in a straitjacket. "The court need only make a reasonable estimate of the loss. The sentencing judge is

in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, Application Note 3(C). Since the guidelines are no longer binding, *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220 (2005), the judge need not give controlling weight to the present-value calculation.

Of particular relevance to the present case, the nature and circumstances of the defendant's crime may make discounting to present value of only limited utility in assessing loss. Peel's attempted blackmail of his ex-wife is a case in point. A blackmailer is apt not to stick to his deal with his victim but instead to come back for more later, as in *Commonwealth v. Beauchamp*, 732 N.E.2d 311, 316-17 (Mass. App. 2000), and *United States v. Veltmann*, 6 F.3d 1483, 1488-89 (11th Cir. 1993), so that the initially intended loss is apt to understate the loss to the victim had the blackmail succeeded. True, if Peel were to give all the photos back to his ex-wife, as he promised to do, he could not have blackmailed her further. But there would have been no assurance that he would do that, since she didn't know how many of the photos he had. And even if the blackmailer doesn't return for more, the victim is apt to be in constant fear of such a return, adding to the cost of the crime. Ronald H. Coase, "The 1987 McCorkle Lecture: Blackmail," 74 *Va. L. Rev*. 655, 674-75 (1988).

This case has to be remanded for other reasons, and we leave to the discretion of the district judge whether to discount the monetary loss inflicted by a blackmail

attempt (in this case an intended such loss) to its present value and how best to weigh that determination in deciding on an appropriate sentence.

Besides not discounting the future loss intended by Peel, the judge added a further intended loss—the $611,000 in other claims that had been filed in the bankruptcy proceeding. By bringing the total intended loss above $1 million (it would have fallen just short of that amount had he done the present-value calculation of the ex-wife's future loss suggested above), the addition further increased Peel's guidelines sentencing range. That addition was error. None of the other creditors (or anyone else) would have been hurt had the blackmail attempt succeeded; nor was it any part of the defendant's intention to hurt them. Intended losses are intended losses, not bookkeeping entries. See *United States v. Arthur*, 582 F.3d 713, 720-21 (7th Cir. 2009); *United States v. Bussell*, 504 F.3d 956, 960-63 (9th Cir. 2007); *United States v. Holthaus*, 486 F.3d 451, 455 (8th Cir. 2007); *United States v. Wheeldon*, 313 F.3d 1070, 1073 (8th Cir. 2002). The creditors would actually have been better off had the blackmail attempt succeeded because there would then have been one less creditor with whom to divide the defendant's meager assets. The bankruptcy court would not have been hurt merely because one creditor had dropped out. In fact it would have saved time by not having to adjudicate that creditor's claim.

The remaining sentencing issue is whether the judge was right to apply section 2G2.2(b)(3)(A) of the sentencing guidelines, which increases the guidelines sentencing range for child pornography if the pornography

was "distribut[ed] for pecuniary gain." The pecuniary gain, the judge determined, was the amount of money that the defendant had hoped to gain from his blackmail attempt. The defendant was offering to sell the pornographic photographs to his ex-wife for forgiveness of part of his debt to her under their marital settlement agreement.

The primary aim of the pecuniary-gain enhancement is to discourage trafficking in pornography, which increases the incentive to create pornography and thus the amount and so the number of abused children, the "models" for the photographs. *New York v. Ferber*, 458 U.S. 747, 761-62 and n. 13 (1982); see also *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007); *United States v. Richardson*, 238 F.3d 837, 839 (7th Cir. 2001). But the use of pornography for blackmail is not obviously less bad conduct than the sale of pornography in the market. The defendant used pornography to avoid a debt and thus for pecuniary gain, and we think that brings him within the scope of the guidelines provision.

It's true that in ordinary language "distribution" suggests sale to more than one person. But in the guidelines it means "*any act*, including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor," U.S.S.G. § 2G2.2, Application Note 1 (emphasis added). That must include a single sale. Moreover, the defendant was offering to sell to his ex-wife a number of photos, and it is hard to see why selling one pornographic photo to

each of (say) five people deserves a heavier punishment than selling five photos to one person, especially given the underlying concern with the harm to the child model used in the photographs.

To conclude, the judgment is affirmed in part and reversed in part, and the case remanded with directions that the judge vacate either the bankruptcy fraud conviction or the obstruction of justice conviction, recalculate the intended loss, redetermine the guidelines sentencing range, and resentence the defendant in accordance with 18 U.S.C. § 3553(a).

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS.
