[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14045
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-20570-RWG-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YESENIA POUPARINA,
a.k.a. Yesenia Campos,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 19, 2014)

Before ED CARNES, Chief Judge, TJOFLAT and FAY, Circuit Judges.

PER CURIAM:

After making misrepresentations to secure a reverse mortgage loan insured by the United States Department of Housing and Urban Development (HUD), Yesenia Pouparina was convicted of wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  She was sentenced to 46 months imprisonment, the top of her advisory sentence range, after the district court calculated a loss amount of approximately $208,000.  She appeals her sentence, contending that the district court miscalculated the actual loss amount attributable to her crimes.

I.

In 2009 Pouparina applied for a $413,863.86 Home Equity Conversion Mortgage (HECM) loan that was in her mother's name but that was secured by a reverse mortgage on her own home, which was valued at about $600,000 at the time.  Pouparina certified in the application that her mother lived on the property and that the loan proceeds would be disbursed to her mother.  Those statements were false.[1]  Pouparina's mother had been living elsewhere for more than 15 years, and when the loan was approved and disbursed Pouparina arranged to have the funds deposited into her own bank account.  She then used those funds to pay for her personal and business expenses.

---

[1] The misrepresentations were evidently made in order to meet the eligibility requirements for an HECM loan.  Among other things, an HECM borrower must be at least 62 years old and be the primary resident of the home for which the borrower is seeking the mortgage.  Pouparina was only 37 years old when she applied for the loan in her mother's name.

2

In order to close the loan, Pouparina paid $115,000 to an unrelated lender who had an existing mortgage on her property and she paid about $44,000 in closing costs.  About two years later, she learned that her loan was being investigated by federal authorities, and that prompted her to approach the mortgage lender, Generation Mortgage Company, about selling her property for a reduced amount in a short sale.  Her property was sold at a loss in 2012, with about $216,000 in proceeds going to Generation Mortgage.

Based on the false statements she made in the HECM loan application, Pouparina was indicted on four counts of wire fraud and one count of mail fraud.  A jury convicted her on all five counts.  At sentencing, the district court calculated her advisory sentence and assigned her a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), a 12-level enhancement under § 2B1.1(b)(1)(G) based on an actual loss amount of approximately $208,000, and a 2-level enhancement under § 3B1.3 because Pouparina had used a special skill to facilitate the crime.  With no prior criminal convictions, Pouparina fell within criminal history category I, and her advisory sentence range was 37–46 months imprisonment.  She was sentenced to a prison term of 46 months and ordered to pay about $208,000 in restitution.

## II.

Pouparina challenges the district court's guidelines calculation, arguing that it miscalculated the loss amount from her fraud and therefore wrongly applied a

3

12-level enhancement under § 2B1.1(b)(1)(G).  She claims that the district court made three errors.  First, she contends that the court violated Application Note 3(D)(i) of § 2B1.1 by not excluding from the actual loss the approximately $44,000 in closing costs associated with the HECM loan.  Second, she contends that she was entitled to a credit against loss for satisfying a $115,000 mortgage on her property, which she claims increased the property's value as collateral for the loan.  Third, she contends that the district court erred by concluding that the loss amount was the same as the amount of restitution requested by the government.

"We review a district court's interpretation of the Sentencing Guidelines <u>de novo</u>, and the determination of the amount of loss involved in the offense for clear error."  <u>United States v. Maxwell</u>, 579 F.3d 1282, 1305 (11th Cir. 2009).  "Clear error will be found only if [we are] left with a definite and firm conviction that a mistake has been committed."  <u>Id.</u> (quotation marks omitted).

With respect to Pouparina's first contention, the district court correctly concluded that Application Note 3(D)(i) of § 2B1.1 did not require it to exclude from the actual loss approximately $44,000 in closing costs that Pouparina paid when she secured the HECM loan in 2009.  Application Note 3(D)(i) provides that "[l]oss shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."  The purpose of that application note is to ensure that "the offense

4

level for a financial crime is not increased if the prosecution is delayed, even though the delay increases the cost of the crime." United States v. Peel, 595 F.3d 763, 772 (7th Cir. 2010). Closing costs are not explicitly mentioned in Application Note 3(D)(i) and they do not qualify as "other similar costs" within the meaning of that application note here because the closing costs were a fixed amount that was incurred only when the loan was originally taken out. Those costs would not have increased if the prosecution delayed bringing its case, so they do not fall within the scope of Application Note 3(D)(i). See id.

As for Pouparina's second contention, the district court did not clearly err when it refused to apply a credit against loss for the $115,000 payment that Pouparina made, as a condition to obtaining the HECM loan, to satisfy an existing mortgage on her property. Pouparina was entitled to (and received) a credit against loss for the approximately $216,000 that her lender recovered when the property was sold. See U.S.S.G. § 2B1.1 app. n.3(E)(ii) (providing that "[i]n a case involving collateral pledged or otherwise provided by the defendant" the loss amount shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral"). Given that her home was eventually sold in a short sale at a substantial loss, she has not shown that paying off the existing mortgage, a step that the lender required her to take in order to

receive the loan, diminished Generation Mortgage's losses below the amount that the district court found.

Finally, the district court did not clearly err when it determined that the loss amount would be the same as the amount of restitution that it was ordering. When the § 2B1.1(b)(1) loss amount is calculated based on actual loss instead of intended loss, as it was in this case, one would expect the amount of restitution and the loss amount to be the same. See United States v. Huff, 609 F.3d 1240, 1247–48 (11th Cir. 2010) (discussing how restitution matches "the actual losses suffered by the victims") (quotation marks omitted); see also 18 U.S.C. § 3663(b).

In calculating the guidelines range, the district court was not required to make a precise determination of the loss amount. United States v. Barrington, 648 F.3d 1178, 1197–98 (11th Cir. 2011). Instead, it had to make only a reasonable estimate of the loss based on the information available. Id. That is what it did in this case when it found an actual loss amount of about $208,000, which was the amount that Generation Mortgage sought from HUD as the insurer on the loan. The district court did not commit clear error in determining the loss amount. See id.

**AFFIRMED.**

6