[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11301
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-20739-FAM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JONATHAN TORRES-BONILLA,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 26, 2014)

Before PRYOR, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Jonathan Torres-Bonilla appeals his convictions and sentence for using an

unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2); possessing 15

or more unauthorized access devices with intent to defraud, in violation of 18 U.S.C. § 1029(a)(3); and transferring, possessing, or using, without lawful authority, the means of identification of another, in violation of 18 U.S.C. § 1028A(a)(1).  We affirm.

## I. BACKGROUND

On November 25, 2011, Aventura Police Department, Crime Suppression Unit Detective Kenneth Sealy was on patrol at the Aventura Mall in Aventura, Florida.  Mall security alerted Detective Sealy to the presence of Torres-Bonilla at an ATM on the first level.  Detective Sealy and his partner, Detective Sean Bergert, observed Torres-Bonilla remove a plastic card from his right pocket, swipe his left hand over the back of it, insert the card into the ATM, remove the card and currency, place it in his left pocket, and then take a different card from his right pocket to repeat the process.  When an individual stood in line behind him, Torres-Bonilla stopped using the ATM and walked toward a second ATM in the mall.  Torres-Bonilla repeated this same transaction pattern at a second and third ATM.  At a fourth ATM, Torres-Bonilla stood in line behind another person; when someone got in line behind him, he walked away.

Torres-Bonilla exited the mall and Detectives Sealy and Bergert decided to make contact with him.  Detective Sealy displayed his badge and called out, "Sir, excuse me.  Police."  R at 441.  Torres-Bonilla looked back but did not stop.

2

Detective Sealy then shouted, "Sir, police. Can I speak with you?" R at 441.

Torres-Bonilla turned around; he again failed to stop. He then ran away at a light

jogging pace and entered the driver's seat of a minivan. He started to drive away,

but another officer, who was driving an unmarked car, responded and pulled in

front of Torres-Bonilla's vehicle to block his exit.

Detectives Sealy and Bergert approached the minivan. Detective Sealy

approached the driver's side of the vehicle and smelled a strong odor of burned

marijuana inside. Torres-Bonilla was in the front seat, his girlfriend was in the

passenger seat, and an infant child was in a car seat in the back seat. Detective

Sealy did not have his weapon drawn, and Detective Bergert could not recall

whether he had drawn his weapon.[1] Detective Sealy identified himself as a police

officer, explained he was investigating suspicious behavior he had observed inside

the mall, and requested Torres-Bonilla's identification. Torres-Bonilla refused.

Detective Sealy again stated his request. When Torres-Bonilla again refused,

Detective Sealy warned that failure to provide identification could result in his

arrest under Florida law. Detective Sealy asked Torres-Bonilla about the ATM

transactions and the smell of marijuana, to which Torres-Bonilla responded the

cards were his and Detective Sealy's "nose must [have been] broken." R at 469.

Torres-Bonilla refused to identify himself for a third time. Detective Sealy

---

[1] Torres-Bonilla testified Detective Bergert had drawn his weapon and had pointed it at him, when the detectives approached Torres-Bonilla's van.

3

arrested him for resisting an officer without violence and for loitering and prowling, in violation of Florida law. *See* Fla. Stat. §§ 843.02, 856.021.

Detective Sealy then searched Torres-Bonilla. He found nine Wal-Mart prepaid debit cards, several ATM withdrawal receipts, and over $1,700 in cash. All of the cards had an activation label on the back that appeared to have been pulled back; underneath the label, there was a person's written name and a numerical code that appeared to be a personal identification number. The ATM receipts showed withdrawals in the mall shortly before Torres-Bonilla was stopped.

Torres-Bonilla's vehicle was checked for visible weapons and then towed to the Aventura Police Station. Pursuant to department policy, the officers conducted an inventory search of the vehicle. The search uncovered additional Wal-Mart debit cards in Torres-Bonilla's girlfriend's purse and in the baby bag, additional ATM receipts, and about two grams of marijuana within two plastic bags. In total, the search of Torres-Bonilla and his vehicle yielded 28 Wal-Mart debit cards and ATM receipts reflecting approximately $4,000 in withdrawals, dated November 23, 2011, through November 25, 2011.

Further investigation revealed the transaction history for the cards. The transaction history showed the U.S. Treasury had deposited several individuals' tax refunds into the accounts associated with the cards. Twenty-eight debit cards were

loaded with approximately $117,000 in 2010 tax refunds in the names of 28 different victims.

A federal grand jury indicted Torres-Bonilla for using an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2); possessing 15 or more unauthorized access devices with intent to defraud, in violation of 18 U.S.C. § 1029(a)(3); and transferring, possessing, or using, without lawful authority, the means of identification of another, in violation of 18 U.S.C. § 1028A(a)(1).  Prior to trial, Torres-Bonilla moved to suppress all physical and testimonial evidence found as a result of his arrest.  The district judge heard the evidence and denied the motions.  The judge determined Torres-Bonilla's arrest and the searches of his person and his car were based on probable cause.

After a jury trial, Torres-Bonilla was found guilty on all six counts.  He moved for a judgment of acquittal or new trial and argued in part the district judge had violated his rights under the Confrontation Clause by limiting a portion of his cross-examination of Detective Sealy.  The motion was denied; the district judge subsequently sentenced Torres-Bonilla to 192 months of imprisonment and 3 years of supervised release.

Torres-Bonilla raises five arguments on appeal.  First, he argues the district judge erred when he denied his motion to suppress.  Second, he asserts the district judge violated Torres-Bonilla's right to confront the witnesses against him at trial

by placing a time limit on his cross-examination of a police officer and by not allowing him to recall the officer during the defense case-in-chief. In his final three arguments, Torres-Bonilla contends the district judge clearly erred when he assessed Sentencing Guideline enhancements for (1) a loss amount of more than $120,000, (2) the production or trafficking of an unauthorized or counterfeit access device, and (3) 10 or more victims.

## II. DISCUSSION

A. <u>Motion to Suppress</u>

Torres-Bonilla argues the district judge erred when he denied his motion to suppress. We review the denial of a motion to suppress as a mixed question of law and fact. *United States v. Gordon*, 231 F.3d 750, 753-54 (11th Cir. 2000). Rulings of law are reviewed de novo, while the district judge's findings of fact are reviewed for clear error. *Id.* When considering a ruling on a suppression motion, all facts are construed in the light most favorable to the prevailing party. *Id.* at 754.

Officers may stop and briefly detain a person to investigate a reasonable suspicion of criminal activity, even though probable cause may be lacking. *See Gordon*, 231 F.3d at 754 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)). When determining whether reasonable suspicion exists, a judge must review the totality of the circumstances to ascertain whether officers had a particularized and

objective basis to suspect unlawful conduct. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002). Flight from law enforcement is a relevant factor in determining whether reasonable suspicion exists. *See Gordon*, 231 F.3d at 756-57.

Whereas an investigatory detention requires only reasonable suspicion, a seizure or arrest must be supported by probable cause. *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007). Probable cause to arrest exists when the totality of the circumstances warrants a reasonable belief that the suspect has committed or is committing a crime. *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007). Whether a *Terry* stop has matured into an arrest depends on several factors, including: (1) the law-enforcement purposes served by the detention; (2) the diligence with which officers pursued the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention. *Virden*, 488 F.3d at 1321. Some restriction of freedom of movement alone is not sufficient to transform a *Terry* stop into a de facto arrest. *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004). Similarly, an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon. *Id.*

Two detectives with debit-card-fraud training and experience watched Torres-Bonilla conduct suspicious transactions at multiple ATMs in the same mall. The detectives observed Torres-Bonilla peel stickers from each ATM card, look

around to check to see if he was being watched, take a long route from one ATM to another after seeing uniformed officers walking toward him, and leave ATM lines when others got in line behind him.  Torres-Bonilla also ignored the detectives' requests to stop and speak with them as he walked with a quickening pace toward his van.  Construing these facts in the light most favorable to the government, *Gordon*, 231 F.3d at 753-54, there was reasonable suspicion that criminal activity was afoot.  *See Arvizu*, 534 U.S. at 273, 122 S. Ct. at 750; *Gordon*, 231 F.3d at 756-57.

Contrary to Torres-Bonilla's argument, his brief, initial detention—during which one officer may have drawn his weapon—did not constitute an arrest requiring probable cause.  When the officers first stopped Torres-Bonilla, they did not place him in handcuffs, take him into custody, or move him or his van to another location.  *Cf. Virden*, 488 F.3d at 1321 (concluding a seizure which involved transporting  the defendant's vehicle to a new location two miles away and, without formally arresting him, handcuffing the defendant and driving him to another location was "unreasonable absent probable cause because of its scope and intrusiveness").  Rather, Detective Sealy immediately told Torres-Bonilla why the officers wanted to speak with him and asked for his driver's license.  *See Acosta*, 363 F.3d at 1146; *Gordon*, 231 F.3d at 754.  Regardless of whether an officer had

8

his weapon drawn, the officers acted quickly in a manner designed to confirm or dispel their suspicions.  *See Acosta*, 363 F.3d at 1146.

Moreover, there was probable cause to arrest Torres-Bonilla under section 856.021, Florida Statutes, almost immediately after his initial detention began, once he refused the officers' request for identification.  Under Florida law: "It is unlawful for any person to loiter or prowl in a place, at a time or in a manner not usual for law-abiding individuals, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity."  Fla. Stat. § 856.021(1).  "Alarm" is presumed under the second element of § 856.021 if, when law enforcement appears, the defendant flees or refuses to identify himself.  *See State v. Ecker*, 311 So.2d 104, 106 (Fla. 1975); *see also* Fla. Stat. § 856.021(2) ("Among the circumstances which may be considered in determining whether such alarm or immediate concern is warranted is the fact that the person takes flight upon appearance of a law enforcement officer [or] refuses to identify himself or herself.").  A person's refusal to respond to a request for identification is "merely a circumstance to consider in deciding whether the public safety is threatened," which "comes into play only after the two elements of section 856.021 have been established."  *Watts v. State*, 463 So. 2d 205, 207 (Fla. 1985).

The officers' observations of Torres-Bonilla inside the mall satisfied the first element of section 856.021, because the officers saw him loitering at several ATMs "in a manner not usual for law-abiding individuals." *See* Fla. Stat. § 856.021(1); *Ecker*, 311 So. 2d at 106. Regarding the second element, the officers were entitled to be reasonably and justifiably concerned that the property of others was at risk, based on the combined sum of all of Torres-Bonilla's suspicious activities in the mall, his attempts to evade the officers, and his refusal to provide identification. *See* Fla. Stat. § 856.021(1), *Watts*, 463 So. 2d at 207; *Ecker*, 311 So. 2d at 106. Accordingly, the district judge properly denied Torres-Bonilla's motion to suppress.

B. Limiting Cross-Examination

Torres-Bonilla argues the district judge violated his right to confront the witnesses against him at trial by placing a time limit on his cross-examination of Detective Sealy and by not allowing him to recall the detective during the defense case-in-chief. We generally review a district judge's decision to limit cross-examination for abuse of discretion. *See United States v. Maxwell*, 579 F.3d 1282, 1295 (11th Cir. 2009). A district judge's discretion in limiting the scope of cross-examination, however, also is subject to the Sixth Amendment. *Id.*

To show a Confrontation Clause violation, a defendant must establish he was prohibited from engaging in otherwise appropriate cross-examination designed

10

to show a witness's bias, and thereby to expose facts from which jurors could appropriately draw inferences relating to the witness's reliability. *United States v. Orisnord*, 483 F.3d 1169, 1178 (11th Cir. 2007). The fact that a defendant sought to explore bias on the part of a prosecution witness does not automatically void the judge's ability to limit cross-examination. *Maxwell*, 579 F.3d at 1296. The defendant is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to the extent, the defendant might wish. *Id.* Similarly, a defendant is entitled to cross-examine a witness only if the information sought to be elicited is relevant. *Id.*

Torres-Bonilla has not established the district judge prohibited him from recalling Detective Sealy during the defense case-in-chief. Although the judge initially stated Torres-Bonilla could not recall Detective Sealy, the judge thereafter instructed counsel for Torres-Bonilla to discuss his proposed line of questioning of Detective Sealy off the record before calling him again. Counsel agreed but did not seek to recall Detective Sealy thereafter.[2]

Additionally, Torres-Bonilla has not shown the district judge's limitation of his previous cross-examination of Detective Sealy during the prosecution's case

---

[2] We agree that placing time limits on the examination of witnesses is no substitute for limiting the examination in accordance with the Federal Rules of Evidence. If the examination is proper, artificial time limits simply have no place in the proceedings. *See United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987) (recognizing that a district judge should use care when choosing to expedite cases, and "[a] case involving a defendant facing a prison sentence is much more important than an overcrowded court docket"), *overruled on other grounds by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989).

11

violated his confrontation rights.  Although Torres-Bonilla has identified several questions he would have asked Detective Sealy, had he been given more time, he has not explained how the answers to any of his proposed questions would have exposed bias.  His proposed question about what would have happened had he produced his driver's license would have been irrelevant.  *See Maxwell*, 579 F.3d at 1296.  His proposed questions about why names and numbers appeared on stickers on the debit cards found in his possession similarly would have been inappropriate, because there was no suggestion that Detective Sealy had anything to do with the information on the cards.  While Torres-Bonilla asserts he wanted to inquire why certain investigative methods were not used, he has not explained how the answers to any of those questions would have exposed bias or otherwise been relevant to any contested issues.  *See id.*; *Orisnord*, 483 F.3d at 1178-79.

Moreover, during Torres-Bonilla's cross-examination of Detective Sealy, Torres-Bonilla was able to expose (1) inaccuracies in Detective Sealy's initial incident report, (2) Detective Sealy's failure to acquire video recordings of the incident, (3) Detective Sealy's failure to record his conversation with Torres-Bonilla, and (4) Detective Sealy's failure to verify Torres-Bonilla personally had engaged in every transaction associated with all of the debit cards and to obtain the personal identification numbers associated with each of the cards.  Torres-Bonilla further elicited from Detective Sealy that, although Detective Sealy testified he

12

smelled burned marijuana when he first approached Torres-Bonilla's van, no marijuana was found during the initial search of the van. Torres-Bonilla asked Detective Sealy several questions about officers' activities the day of Torres-Bonilla's arrest. He had an adequate opportunity to present the jury with sufficient evidence with which to evaluate Detective Sealy's credibility, and Torres-Bonilla has not shown how additional questioning would have given a reasonable jury a different impression of Detective Sealy's credibility. *See Maxwell*, 579 F.3d at 1296; *Orisnord*, 483 F.3d at 1178-79. Therefore, Torres-Bonilla has not shown the district judge abused his discretion when he limited further questioning of Detective Sealy.[3]

C. Sentencing Guidelines Enhancements

Torres-Bonilla argues the district judge clearly erred, when he assessed Sentencing Guidelines enhancements for (1) a loss amount of more than $120,000, (2) the production or trafficking of an unauthorized or counterfeit access device, and (3) 10 or more victims.

1. Loss Determination

We review a district judge's loss determination for clear error, and his interpretation of the Sentencing Guidelines de novo. *United States v. Barrington*,

---

[3] While Torres-Bonilla makes a passing assertion that the judge's limitation violated his right to compulsory process, he has failed to advance additional arguments in support of his assertion; consequently, he has abandoned this issue. *See United States v. Woods*, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012) (explaining that an appellant abandons an issue if he fails to develop any argument in support of it in his opening brief).

648 F.3d 1178, 1197 (11th Cir. 2011). The loss determination need not be made with precision; the figure need only be a reasonable estimate given the available information. *Id.* The amount of loss must be proved by a preponderance of the evidence; the burden must be satisfied with "reliable and specific evidence." *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) (citation and internal quotation marks omitted).

Under the Sentencing Guidelines, a defendant's offense level is increased by 8 levels where the loss exceeds $70,000, but is less than $120,000, and by 10 levels where the loss exceeds $120,000, but is less than $200,000. *See* U.S.S.G. § 2B1.1(b)(1)(E), (F). In determining a defendant's offense level based on the amount of loss, the district judge must take into account the conduct charged and all relevant actions. *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009). In a case involving counterfeit or unauthorized access devices, the minimum loss amount is $500 per access device. U.S.S.G. § 2B1.1, cmt. n.3(F)(i).

During Torres-Bonilla's trial, the government presented testimony that: (1) most of the account-holders associated with each card were born in 1941 or 1942; (2) most of the account-holders were clients of Compass Health System, where the mother of Torres-Bonilla's child worked; and (3) 28 tax returns filed for the year 2010 all resulted in refunds of similar amounts deposited in accounts associated with prepaid cards, all of which had the same routing number. Torres-Bonilla has

not shown the district judge clearly erred when he determined the initial tax-refund deposits associated with the 23 cards for which information was available—$117,949.69—constituted relevant conduct and was a reasonable estimate of the losses associated with those 23 cards. *See* U.S.S.G. §§ 1B1.3(a)(2), 2B1.1 & cmt. n.3(A); *Barrington*, 648 F.3d at 1197; *Hoffman-Vaile*, 568 F.3d at 1344. Because actual-loss information was not provided for the remaining 5 cards, the district judge properly imposed the minimum loss amount of $500 per card. *See* U.S.S.G. § 2B1.1, cmt. n.3(F)(i). Based on a total of $120,449.69, the district judge did not clearly err when he determined the loss amount exceeded $120,000.[4]

2. Production of an Unauthorized Device

We review a district judge's application of a sentencing enhancement for production of an unauthorized access device for clear error. *See Barrington*, 648 F.3d at 1203. A two-level enhancement applies where the offense involved the "production or trafficking" of any "unauthorized access device or counterfeit access device." U.S.S.G. § 2B1.1(b)(11)(B)(i). The term "access device" includes account or personal identification numbers that can be used to initiate a transfer of funds. *See* 18 U.S.C. § 1029(e); *Barrington*, 648 F.3d at 1201. An access device is "counterfeit" if it is forged and "unauthorized" if it has been obtained with intent

---

[4] Because Torres-Bonilla has advanced no additional arguments in support of his passing assertion that the amount of restitution imposed by the judge also was improper, that argument also fails. *See Woods*, 684 F.3d at 1064 n.23.

to defraud.  U.S.S.G. § 2B1.1, cmt. n.9(A) (citing 18 U.S.C. § 1029(e)(2), (3));

*Barrington*, 648 F.3d at 1201.  The term "production" includes duplication.

U.S.S.G. § 2B1.1, cmt. n.9(A); *Barrington*, 648 F.3d at 1201.

Torres-Bonilla has not shown the district judge clearly erred when he

determined the initial tax-refund deposits associated with 23 of the cards at issue

constituted relevant conduct.  In order to obtain the improper tax refunds, it was

necessary to duplicate the Social Security numbers of others with intent to defraud

the United States Treasury.  The judge correctly found Torres-Bonilla's relevant

conduct included the duplication or "production" of Social Security numbers that

were obtained with intent to defraud to be "unauthorized access devices."  *See* 18

U.S.C. § 1029(e); U.S.S.G. § 2B1.1(b)(11)(B)(i) & cmt. n.9(A); *Barrington*, 648

F.3d at 1201.

3. Number of Victims

We review a district judge's calculation of the number of victims for clear

error.  *United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013).  A two-

level sentencing enhancement applies, where the offense involved 10 or more

victims.  U.S.S.G. § 2B1.1(b)(2)(A).  In cases involving means of identification,

the term "victim" includes "any individual whose means of identification was used

unlawfully or without authority."  *Id.* § 2B1.1, cmt. n.4(E)(ii); *United States v.*

*Philidor*, 717 F.3d 883, 885-86 (11th Cir. 2013) (per curiam).  When the Internal

16

Revenue Service issues refunds for tax returns listing certain Social Security numbers, the district judge may infer the Social Security numbers correspond to actual persons. *Philidor*, 717 F.3d at 885.

Torres-Bonilla has not shown the district judge clearly erred in determing the tax refunds associated with 23 cards constituted relevant conduct. In order to obtain those refunds, it was necessary to duplicate the Social Security numbers of 23 people. *See id.* Based on the testimony of 3 victims, who testified at Torres-Bonilla's trial, and the similarities between all of the relevant tax returns, the judge was entitled to find the Social Security numbers of the 23 persons whose tax refunds were deposited on the cards were used without the authority of those persons. Consequently, the judge correctly concluded Torres-Bonilla's relevant conduct included the unauthorized use of the Social Security numbers of 23 persons, and the offense involved 10 or more victims. *See* U.S.S.G. § 2B1.1(b)(2)(A) & cmt. n.4(E)(ii); *Philidor*, 717 F.3d at 885-86.

**AFFIRMED.**